STATE EX REL. NORMAL HALL, INC., Appellant, vs. GURDA,
Inspector of Buildings, Respondent.

*March 12—April 9, 1940.*

A. W. *Schutz* of Milwaukee, for the appellant.

For the respondent there was a brief by *Walter J. Mattison,* city attorney, *Omar T. McMahon* and *Cornelius J. Merten,* assistant city attorneys, and oral argument by *Mr. McMahon.*

FRITZ, J.   The appeal by the relator, Normal Hall, Inc., is from a judgment denying its petition for a writ of *mandamus* to require Leon M. Gurda, as inspector of buildings of the city of Milwaukee, to issue a building permit to

the relator for the erection of a gasoline service station, usable as a business structure, on its premises. The permit was refused on the ground that by a zoning ordinance adopted in 1920 the premises in question were established as part of a "D" area residence district, which was changed by an amendment in 1932 to a "B" area residence district; and that no building could be erected for business purposes in either of these areas in a residence district. The relator's premises, which are described as the west eighty feet of lots 8, 9, and 10, except the south fifteen feet of lot 8, in block 5, in Kenwood Park, which is a subdivision in the Eighteenth ward of Milwaukee, have a total frontage of eighty feet on East Kenwood boulevard on the south, and one hundred fifteen feet on North Downer avenue on the west. Adjacent on the north to lot 10 there is also in block 5 a parcel consisting of lots 11, 12, 13, and 14, which has a total frontage of one hundred sixty-five feet on North Downer avenue on the west, and one hundred twenty feet on East Hampshire street on the north. At the time of the enactment of the zoning ordinance in 1920 there were and ever since there have been store buildings used for business purposes on lots 11, 12, 13, and 14, and there has been a one-family residence, fronting on East Kenwood boulevard, on the forty feet of lots 8, 9, and 10, adjacent to relator's west eighty feet of these lots; and all of the other lots in block 5 have been used solely for residence purposes. No buildings have been erected on the relator's premises, which were purchased in September, 1927, by Oscar A. Strauss and wife, who conveyed them in July, 1938, to the relator, a corporation, the stock of which is owned by Strauss and his wife. The value of these premises is (as was found by the court) $8,000 if used for residential purposes, and $16,000 if used for business purposes. By the ordinance enacted in 1920, and amended in 1921, the city of Milwaukee was zoned into four classes of districts (a) "residence districts," (b) "local busi-

ness districts," (c) "commercial and light manufacturing districts," and (d) "industrial districts;" and the parcel consisting of lots 11, 12, 13, and 14, in block 5, in Kenwood Park was established as a local business district; but lots 8, 9, and 10 in the block, as well as all of the rest of Kenwood Park and most of the Eighteenth ward, in which it was located, were established as a "D" residence district. The action amending the zoning ordinance in October, 1932, so as to place relator's premises in a "B" area residence district, was taken by the common council in the course of proceedings in a proposed amendment sought by Strauss to have the premises included in the local business district, instead of in the residence district. The council referred the proposed amendment to the board of public land commissioners and during the course of its hearings,—at which seventeen owners of residential property in the neighborhood objected to that amendment, and Strauss appeared in person and by his attorney,—Strauss finally agreed to the adoption of a substitute ordinance by which his premises were zoned in the "B" area instead of the "D" area residence district, and pursuant to his agreement he delivered two quitclaim deeds, which were duly recorded, and the purpose and effect of which was to restrict by deed the use of the premises by a voluntarily self-imposed setback of twenty-nine feet, so that no building could be erected upon the southerly twenty-nine feet thereof. By including the premises by the enactment of, the substitute ordinance in a "B" area residence district, the size of the side and rear yards, and consequently the portion of the premises which could be occupied by buildings, and the number of square feet required for each family and the number of family dwelling units permissible in a building, and some other similar matters were changed, with the result that there could be erected thereon, after even deducting Strauss' voluntarily imposed setback, a three-story building containing thirty-nine apartments, of three rooms and bath

each, or fifty-one apartments of one room and bath. Prior to the amendment in 1932, building permits had been granted to Strauss in July, 1928, to build a brick-veneer duplex flat on a portion of lots 8 and 9; in August, 1929, to erect a residential lodginghouse three stories high with twenty-one lodging rooms on a portion of lots 8, 9, and 10; and in December, 1929, to build a residential duplex flat on lot 8. None of these proposed buildings were erected. In 1933 the building inspector denied Strauss' application for a permit to erect a store and apartment building, and that refusal was sustained by the city's zoning board of appeals.

In addition, it suffices to note on this appeal the following facts which were found by the court upon evidence that fully warranted the findings. When the ordinance was enacted in 1920 the one or two-story-high buildings that occupied the small "local business district," which has a frontage of one hundred sixty-five feet on North Downer avenue and one hundred twenty feet on East Hampshire street and is adjacent on the north to the relator's premises, were used for a drugstore, grill, or food shop, beauty shop, grocery, and meat market, confectionery, gift shop, and dental office; and, in addition, a building erected subsequently on East Hampshire street was used by a beauty shop, food shop, and a cleaners and dyers store for merely taking orders. This small "local business district" is one of but four small local business districts in an area which is over a mile north and south and over half a mile east and west in the easterly two-thirds of the Eighteenth ward. Just east of the residence on the forty feet fronting on East Kenwood boulevard, which adjoin the relator's premises on the east, there is a large double house built in 1922 at a cost of $22,000 on a parcel which has a frontage of sixty feet on East Kenwood boulevard and a depth of two hundred forty-eight feet, and has been occupied for residential purposes only. East Kenwood boulevard is one hundred feet in width for the five blocks to

Lake Park on the east and eight blocks to North Oakland avenue on the west of the relator's premises. There are no business buildings on East Kenwood boulevard from Lake Park to North Oakland avenue. The lots on both sides of East Kenwood boulevard from North Downer avenue eastward to Lake Park are occupied exclusively by residential buildings. All land along North Downer avenue for over a half mile to the south, and likewise for a half mile northward from relator's premises to the city limits, has been occupied solely as was permissible in a "residence district," with the exception of the four lots in the small "local business district," adjacent to relator's premises. There are some apartment buildings, churches, two hospitals, and the buildings and grounds of the State Teachers' College, Downer College and Seminary, and the Milwaukee University School, and a public school in some of the blocks north and west of the relator's premises. Surface streetcars were formerly operated on North Downer avenue until bus service was substituted about a year prior to the trial. In the entire Eighteenth ward about fifteen small parcels are used for gasoline stations or service garages.

The court also found that the relator's premises are readily adaptable to residential uses, with buildings facing to the south on East Kenwood boulevard, in harmony with all residences for over five blocks to the east on both sides of the street; that there were good reasons for the common council, as a matter of policy, to zone as a "local business district" the parcel consisting of lots 11, 12, 13, and 14 in question, which were occupied by buildings used for local business purposes at the time of the enactment of the ordinance in 1920, and to constitute the vacant premises, which have been acquired by the relator, part of the "residence district" along with the residential property in the remainder of block 5 and in the neighborhood generally; that the erection upon relator's premises of a proposed neighborhood super gasoline

filling station, and the operation thereof from early in the morning until late in the evening, seven days a week, with the premises lighted from dusk until the closing hour, and the automobile and truck traffic incident to the conduct of such business there, would be detrimental to the proper use and enjoyment of the residences in the immediate vicinity by the respective owners thereof, and that such operations would have a tendency to increase traffic hazards in the neighborhood to the public generally and particularly to minor pupils attending the elementary school conducted upon the State Teachers' College premises, and to persons attending services in three nearby churches; and that it is problematical as to whether the persons owning any such proposed buildings would be able to realize a fair rate on the investment, or the operators of such businesses would be able to realize profit. The court concluded upon the facts found that the common council's acts in enacting the ordinance and amendments were within its powers and not arbitrary, unreasonable, or unlawful; that the building inspector acted with proper authority in refusing to grant the permit for the erection of a gasoline filling station on the relator's premises; and that it has not been deprived of any rights in its premises or the use thereof in contravention of the equal-protection and due-process clauses of the Fourteenth Amendm., U. S. Const., or the provisions of sec. 13, art. I, Wis. Const. Upon this appeal the relator contends that the court erred in arriving at these conclusions. In support of its contentions, the relator claims that the application of the ordinance to its premises is discriminatory because every argument against the maintenance of a filling station thereon is equally applicable to the contiguous parcel where such stations may be maintained under the ordinance; that, although the constitutionality of a general zoning ordinance is no longer open to debate, the application of a particular provision therein in respect to a particular parcel may be adjudged clearly

arbitrary and unreasonable; that there is no compensatory enhancement, but rather an impairment of value consequent upon the restriction in controversy; and that this is in disregard of one of the underlying theories of a zoning ordinance, that uniformity of restriction thereunder will give rise to compensatory advantage by the enhancement rather than impairment of the value of the parcels in a restricted area, and that there is thus met the test which, by reason of constitutional provisions denouncing confiscation and discrimination, is applicable to such enactments under the police power.

These claims and the contentions based thereon cannot be sustained. In enacting the ordinance in 1920, with provisions applicable to areas which were occupied in part, the common council was obliged to draw lines of demarcation under the particular and peculiar circumstances which then existed in respect to the various uses, nature, and other conditions of the buildings and premises in an area. As dividing lines had to be established between residential districts and local business districts, as well as between other types of adjoining districts, the council was confronted in some instances, and especially in respect to the small local business areas existing in the neighborhoods which were otherwise residential, with what may be termed twilight zones or borderline cases as to which it was obliged to exercise its judgment and discretion in creating the dividing line. Such a line of demarcation had to be drawn by the council in the neighborhood in question under the power and authority vested in the council by secs. 959—17$n$ and 959—17$p$, Stats. 1919. It was provided in these sections that the city might "regulate and restrict the location of trades and industries and the location of buildings designed for specified uses" and "establish districts of such number, shape and area as such city may deem best suited to carry out the purposes of this section;" and "for each such district regulations may

be imposed designating the trades or industries that shall be excluded or subjected to special regulations and designating the uses for which buildings may or may not be erected or altered." However, in that connection it was further provided in sec. 959—17$n$ that "such ordinances shall not prohibit the continuance of the use of any building or premises for any trade or industry for which such buildings or premises are used at the time such ordinances take effect, but such ordinances may prohibit the alteration of, or addition to, any existing buildings or structures for the purpose of carrying on any prohibited trade or industry within the district where such buildings or structures are located. The powers herein granted shall be liberally construed in favor of the city exercising them and this act shall not be construed to limit or repeal any powers now possessed by any such city. . . ." And it was provided in sec. 959—17$p$, that "Every city . . ." might "regulate and determine the area of yards, courts, and other open spaces" and "establish districts of such number, shape and area as it may deem best suited to carry out the purpose of this section."

Under these provisions the council was authorized to restrict as it did in 1920 the unoccupied west eighty feet of lots 8, 9, and 10, together with the east forty feet of these lots on which there was a single-family residence which sold for $10,750, and the other residential lots in block 5 in Kenwood Park, to residential use, instead of local business district uses as was done in respect to lots 11 to 14 in the block in question. That action was reasonable and fair in this twilight zone or borderline case. Because of the use for business purposes which then was being made of the buildings on lots 11 to 14, there was applicable to any action by the council in relation to that parcel the inhibition under sec. 959—17$n$, that "such ordinances shall not prohibit the continuance of the use of any building or premises for any

trade or industry for which such buildings or premises are used at the time such ordinances take effect." In view of that inhibition and, on the other hand, the "residence district" use which was being made of all of the adjacent east half of block 5, as well as the other premises along East Kenwood boulevard from Lake Park to North Oakland avenue, the council's action was not arbitrary, unreasonable, or discriminatory. The council was without power to compel the discontinuance of the use which was being made for business purposes of the small parcel, consisting of lots 11 to 14, which fronted on North Downer avenue, but it was within its province to conclude that there was no good reason, under the circumstances, why East Kenwood boulevard should be spoiled as an exclusively residential street by erecting buildings thereon for business purposes. Confronted as the council was with the problem of whether the vacant corner parcel should be zoned for residential purposes on the exclusively residential East Kenwood boulevard side, or zoned for local business purposes to match it up with the small local business property on the North Downer avenue side, it was up to the council to determine whether the rule in relation to uniformity was not better satisfied by treating the parcel, which is now owned by relator, as part of the residential property along East Kenwood boulevard, as well as North Downer avenue, for about a mile, instead of connecting it with the small local business district of but one hundred sixty-five feet along North Downer avenue, which the council had to allow to continue to be used for local business purposes.

To the council's action in these respects there are applicable the established rules that "where a municipal body enacts regulations pursuant to authority expressly granted, all presumptions are in favor of its validity, and any person attacking it must make the fact of its invalidity clearly ap-

pear" (*State ex rel. Newman v. Pagels,* 212 Wis. 475, 479, 250 N. W. 430); and that "where different conclusions as to just where the lines of a district should be may be drawn from the evidence submitted, the conclusion adopted by the legislative body cannot be interfered with." *La Crosse v. Elbertson,* 205 Wis. 207, 212, 237 N. W. 99. Likewise there is applicable, under the facts and circumstances herein, the statement in *Zahn v. Board of Public Works,* 274 U. S. 325, 328, 47 Sup. Ct. 594, 71 L. Ed. 1074, that,—

"The most that can be said is that whether that determination was an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question." *Nectow v. Cambridge,* 277 U. S. 183, 48 Sup. Ct. 447, 72 L. Ed. 842; *Women's Kansas City St. Andrews Soc. v. Kansas City* (C. C. A.), 58 Fed. (2d) 593; *Geneva Inv. Co. v. St. Louis,* 87 Fed. (2d) 83; 86 A. L. R. 667–669.

It follows that the council's action cannot be held arbitrary, unreasonable, or unjustly discriminatory; and that, inasmuch as the enactment of a zoning ordinance essential to the well-being of a city is an authorized exercise of the police power subject to which all property is held (*Cayce v. City of Hopkinsville,* 217 Ky. 135, 289 S. W. 223; *Geisenfeld v. Shorewood,* 232 Wis. 410, 415, 287 N. W. 683), there has been no invasion of the relator's constitutional rights under either the equal-protection or the due-process clauses of the Fourteenth amendment to the federal constitution or the provision in sec. 13, art. I, Wis. Const. Although it may be an underlying theory of zoning ordinances that uniformity of restriction generally gives rise to compensatory advantages, which result in the enhancement rather than the impairment of the value of the parcels in the area, it does not necessarily follow that an ordinance is

invalid because some parcel of land, which had not been used for business purposes, is rendered less valuable by being placed in a residential district than it would be if it could be used for business purposes in the future. The possibility of such future consequence is not absolutely controlling since all property is held subject to the proper exercise of the police power. *Geneva Inv. Co. v. St. Louis, supra; Elizabeth City v. Aydlett,* 201 N. C. 602, 161 S. E. 78; *Colorado Springs v. Miller,* 95 Colo. 337, 36 Pac. (2d) 161; *Delano v. City of Tulsa* (C. C. A.), 26 Fed. (2d) 640; *Marblehead Land Co. v. City of Los Angeles* (C. C. A.), 47 Fed. (2d) 528; *Zahn v. Board of Public Works,* 195 Cal. 497, 234 Pac. 388.

The decisions in *Rowland v. Racine,* 223 Wis. 488, 271 N. W. 36; *State ex rel. Tingley v. Gurda,* 209 Wis. 63, 243 N. W. 317; *Geisenfeld v. Shorewood, supra,* are readily distinguishable in that the small parcel in question in each of these cases was not in a twilight zone or on the border line between an established residential neighborhood and a small local business area to which there was applicable, as in the case at bar, the inhibition by reason of the above-quoted provision in sec. 959—17n, Stats. 1919, but was in the midst of a business or industrial district because of which the placing of the parcel by a zoning ordinance in a residence district was clearly unreasonable, arbitrary, and void.

*By the Court.*—Judgment affirmed.